***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award except for the following modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the deputy commissioner as
 STIPULATIONS
1. On October 5, 1998, the date of the injury by accident, the parties were bound by and subject to the North Carolina Workers' Compensation Act.
2. On October 5, 1998, the employee-employer relationship existed between the plaintiff and the employer Cantrell Construction Company.
3. On October 5, 1998, the employer was insured by Royal Insurance Companies.
4. The plaintiff received TTD compensation from October 16, 1998 through December 10, 1998. He was paid at the rate of $337.62 per week for a total of $2,700.96.
5. The Industrial Commission will determine the plaintiff's average weekly wage based upon the Form 22 wage statement submitted at the hearing of this case.
6. Each of the clinicians identified as follows is duly licensed by the State of North Carolina and have treated plaintiff for his alleged injury: James J. Hoski, M.D., Ellen Lawson, M.D., Paul B. Duvall, M.D., and Ralph Loomis, M.D.
The plaintiff's issues are:
What additional benefits is plaintiff entitled to including indemnity and medical compensation?
The defendants' issues are:
Whether plaintiff sustained a second compensable event or an aggravation of his previous injury subsequent to his return to work in December 1998?
Whether plaintiff's current injury and disability, if any, are related to his own personal medical condition?
Whether plaintiff unjustifiably refused to return to work and/or constructively refused suitable employment after November 5, 1998?
Whether defendants are entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
Whether plaintiff has committed fraud in the continued prosecution of this claim pursuant to N.C. Gen. Stat. § 97-88.2?
9. The parties also stipulated to and submitted as evidence various documents, including plaintiff's medical records.
10. A fee of $50 is approved for the deposition of Mr. Carrington, administrator for Spine Carolina to be paid by plaintiff.
11. Plaintiff's Employment Security Commission Records have been submitted and received into evidence.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional
 FINDINGS OF FACT
1. Plaintiff was fifty years of age as of the date of the hearing before the deputy commissioner. He began working for the defendant as a truck driver in June 1990.
2. On October 5, 1998, plaintiff was working for the employer as a truck driver, when he sustained an admittedly compensable injury to his lower back. Plaintiff was assisting another employee lift a water cooler off a diesel engine, when he noticed burning and pain in his lower back and right hip.
3. Plaintiff was initially seen and treated at Memorial Mission Hospital in Asheville, North Carolina. He presented with complaints of pain in his right leg, which radiated down to his knee and also numbness in the top of his foot.
4. Plaintiff had a previous lumbar laminectomy at the L5-S1 level. Upon examination, plaintiff was noted to have positive straight leg raising on the right. Plaintiff was diagnosed with a lumbo-sacral strain, acute and referred to Dr. James Hoski, a spine surgeon in Asheville, for any follow-up.
5. On October 9, 1998, plaintiff reported to Dr. Hoski, with complaints of low back and right leg pain. He told Dr. Hoski that he had been through two prior back surgeries, one in 1987 and one in 1994. Dr. Hoski reviewed plaintiff's recent x-rays and MRI from 1987, and examined him. Dr. Hoski noted mild disc space narrowing at several disc levels, most notably L5-S1 and T12-L1, and minor anterior spurring in the lumbar areas, which he attributed to post-operative changes and degenerative changes. He noted that plaintiff had rather significant degenerative disc disease and assessed him with an acute lumbar strain. He planned to treat plaintiff's symptoms with medication and work restrictions. He took plaintiff out of work, pending further assessment.
6. Dr. Hoski saw plaintiff again on October 16, 1998, at which time he ordered an MRI. Dr. Hoski also kept plaintiff out of work at that time. The MRI showed the post-surgical changes at L4-5 and L5-S1, mild spinal stenosis, degenerative changes, including a diffuse disc bulge at L3-4.
7. At plaintiff's November 5, 1998 appointment, Dr. Hoski was able to review the MRI results. He determined that the nerves were not being compressed and explained to plaintiff that he had degenerative changes, but no new disc herniation or condition requiring surgery. He prescribed a non-steroidal anti-inflammatory medication and referred plaintiff for physical therapy.
8. At the November 5, 1998 visit, plaintiff told Dr. Hoski that he believed he was capable of driving, though he was concerned about doing the heavy lifting. Dr. Hoski determined that plaintiff was capable of driving a truck and released him for a return to work with restrictions of lifting 25 pounds occasionally, 15 pounds frequently, and 5 pounds constantly. Dr. Hoski planned to see plaintiff again following completion of the physical therapy and planned a functional capacity evaluation in December. An addendum to that office note, which was written on November 19, 1998, clarified that plaintiff was capable of returning to work within the restrictions outlined in Dr. Hoski's notes of November 5, 1998.
9. As part of the check out procedure at Dr. Hoski's office, his staff will give the patient any notes regarding the patient's recommended work status, whether the patient should be kept out of work or given work restrictions. At the office visit of November 5, 1998, Dr. Hoski's staff mistakenly gave plaintiff a note, which was stamped with Dr. Hoski's signature and which stated that plaintiff should be out of work until his follow-up appointment of December 12, 1998, rather than return to work with restrictions. Kim Krickhan, the office assistant had given plaintiff the note. There was some uncertainty as to Dr. Hoski's instructions regarding plaintiff's work status. Plaintiff was in a hurry to check out, so she told him to go ahead while she checked with Dr. Hoski. While plaintiff was checking out, Ms. Krickhan talked with Dr. Hoski, to clarify the plaintiff's work status. She learned that plaintiff was not written out of work, but had been given restrictions for a return to work. By this time, plaintiff had checked out and left the office.
10. Kimberly Krickhan called the plaintiff to let him know that the out of work note was a mistake and that he should return to work. Plaintiff responded that he had a note keeping him out of work and that meant he could stay out of work. Ms. Krickhan told plaintiff that she would notify his employer that he had been released to work.
11. Although this phone conversation between Ms. Krickhan and plaintiff is not recorded in the plaintiff's medical chart, Ms. Krickhan had a clear memory of the phone call. She characterized plaintiff's behavior as "rude" and she further stated that he was "very much a pain to our office over this one note." He threatened to get a lawyer and sue Dr. Hoski. Her testimony about these events is found to be credible.
12. The evidence shows at the least, that the note was mistakenly given to plaintiff by Dr. Hoski's staff. It is not clear who authored the note. Although the circumstances are unusual and somewhat suspicious, the evidence is insufficient to establish, as the defendants contend, that plaintiff himself wrote the part of the note which excused him from work.
13. Plaintiff presented the out-of-work note of November 5, 1998 to his employer. Subsequently, around November 19, the office note from the plaintiff's visit of November 5, 1998 was provided to the carrier and employer, at which time they noted the conflict between the office notes, which approved a release to work with restrictions and the note plaintiff had provided which stated no work until December 15, 1998. Dr. Hoski's addendum note of November 19, 1998, which clarified the situation, was later faxed to the employer by Kimberly Krickhan on December 8, 1998.
14. David Cantrell is president of Cantrell Construction Company. When the employer learned that Dr. Hoski had released plaintiff to work, Mr. Cantrell's wife Cathy Cantrell called plaintiff regarding reporting to work. Plaintiff indicated he would report to work the next day, but did not report to work that day or anytime that month. The employer then sent plaintiff a certified letter dated November 23, 1998 instructing him to return to work on November 30, 1998. After receiving the letter, plaintiff came by the office and told his employer that he could return to work after completing his remaining physical therapy appointments and his doctor's visit, around December 15. The employer, through Mrs. Cantrell agreed to work with him on that plan. Cathy Cantrell put this in a letter to plaintiff dated December 10, 1998.
15. During the period from November 5 through December 14, 1998, plaintiff attended physical therapy appointments three days per week for approximately one hour per day. It would take plaintiff about an hour to travel the distance between his home in Brevard, North Carolina and Dr. Hoski's physical therapy clinic in Asheville. Accordingly, plaintiff's travel and physical therapy participation would keep him out of work for a minimum of three and one-half to four hours per day during his participation in physical therapy.
16. On December 14, 1998, plaintiff underwent a functional capacity evaluation. This evaluation, which was noted to be a valid study with consistent effort given, indicated that plaintiff could perform work in the medium to medium-heavy physical demand level. Following this functional capacity evaluation, Dr. Hoski saw plaintiff on December 15, 1998. At that time, Dr. Hoski released plaintiff to return to his regular duty job primarily driving a truck, with some loading and unloading. Dr. Hoski indicated that plaintiff should use common sense and proper body mechanics. He planned to see plaintiff in four weeks and release him from care if he was stable.
17. On December 16, 1998, plaintiff returned to work driving a truck for Cantrell Construction. During the next two days, he experienced no difficulties performing his work. He experienced no significant aggravation of his back condition, as evidenced by the fact that he made no complaints and did not seek any medical treatment until his regularly scheduled appointment with Dr. Hoski in January 1999.
18. Although plaintiff refused to return to work after being notified of the confusion over his work status note from Dr. Hoski, as a practical matter, he would have been very limited in the hours he could have worked due to his ongoing participation in physical therapy three days per week. He would have missed at least four hours per day three days per week during this time period. After discussion with the employer, the plaintiff and the employer made a reasonable agreement that he would return to work after he completed physical therapy.
19. Although his wife had negotiated the return to work with plaintiff, David Cantrell was not happy about what he perceived as deception on plaintiff's part with regard to the return to work note. He felt that plaintiff had misrepresented his work status. Mr. Cantrell testimony shows that under his company's policies, lying or stealing are grounds for termination. On December 18, 1998, Mr. Cantrell notified plaintiff that he was terminating him "under the laws of the State of North Carolina." He did not tell plaintiff he was terminating him due to his "lie" though that was Mr. Cantrell's motivation. Mr. Cantrell testified that plaintiff was a good worker and his testimony regarding the reason he terminated plaintiff's employment is found to be credible.
20. On January 13, 1999 plaintiff returned for his scheduled visit with Dr. Hoski. Plaintiff complained that he had experienced a flare-up of pain from driving on bumpy roads at work. He reported some subjective complaints that his pain was worse than at his last visit.
21. Dr. Hoski ordered a myelogram and CT scan and then saw plaintiff in follow-up on February 2, 1999. At that time Dr. Hoski reviewed the original myelogram and CT scans, as well as the radiologists report. As Dr. Hoski has testified, there were no acute changes between the 1998 MRI and the 1999 myelogram. The myelogram showed the same diffuse bulging at L4-5 with right L4 neuroforaminal stenosis without clear evidence of nerve root compression. Dr. Hoski's diagnosis remained lumbar sprain/strain. He did not recommend surgery, but recommended a selective nerve root injection at the L5 level, which was performed that day.
22. On March 10, 1999, plaintiff returned to see Dr. Hoski, reporting that the nerve root injection had given him no pain relief. At this time, plaintiff had returned to work in trucking. Dr. Hoski released him from his care, and rated plaintiff with a two percent permanent impairment to his spine as a result of his work related injury. This rating took into consideration and differentiated for the plaintiff's prior back surgery.
23. On March 1, 1999, plaintiff returned to work as a truck driver with McNeely Trucking, earning the same or greater wages than he had earned with the defendant-employer. As Charlie Jones, plaintiff's supervisor with McNeely testified at the hearing, plaintiff was performing his job well, with no apparent difficulties.
24. On December 10, 1999 plaintiff saw Dr. Paul Duvall in Brevard. Plaintiff complained of right leg pain and numbness, which was getting progressively worse. Plaintiff was noted to have positive straight leg raising at approximately 5 on the right. Dr. Duvall assessed possible nerve root compression at L4-5. He put him at bed rest, gave him anti-inflammatory medications and scheduled him for an MRI scan. The MRI scan, which was done on January 5, 2000, consistent with prior studies, showed multiple level disc problems.
25. Dr. Duvall suggested to plaintiff that he stop working as a truck driver, as this may be aggravating his back. He referred plaintiff to see Dr. Angus Graham. There is no indication that plaintiff saw Dr. Graham, but he did continue to see Dr. Duvall for follow-up.
26. On April 25, 2000, plaintiff was seen by Dr. Ralph Loomis, a neurosurgeon in Asheville. Based on his examination, Dr. Loomis diagnosed plaintiff as suffering from foraminal narrowing bilaterally L4-5 with fibrosis and scarring at L5-S1. He did not recommend further therapy or further surgical treatment, but did recommended plaintiff retire from his current employment as a truck driver. Dr. Loomis noted that plaintiff was at maximum medical improvement and rated plaintiff with a twenty percent permanent impairment to his back based upon his prior surgeries at two different levels.
27. On July 7, 2001, plaintiff was again evaluated by Dr. Hoski, with complaints of low back and right leg pain and right lower extremity numbness. Dr. Hoski agreed with Dr. Loomis's recommendation that plaintiff modify his job activities and discontinue his employment as a truck driver.
28. Dr. Hoski is the only physician who testified in this case. His testimony shows that the extent of plaintiff's injury of October 5, 1998 was an acute lumbar sprain/strain. This caused a temporary aggravation of the plaintiff's back condition and pain, but did not cause an actual worsening of the underlying back condition or permanent aggravation. The sprain/strain resolved and is not the cause for plaintiff's ongoing back complaints, which are related to his underlying degenerative back condition and his prior back surgeries.
29. Dr. Hoski testified to his opinion that plaintiff was unable to work from December 17, 1998 to February 24, 1999. However, he acknowledged that this assessment was based, to a great extent, upon what the plaintiff told him and some subjective findings. The greater weight of the evidence fails to support this finding. Plaintiff did not complain of back pain or ask to be excused from work due to back pain during the two days he worked in December. Contrary to his representations to Dr. Hoski, he did not miss work due to back pain. Plaintiff did not seek medical attention from the date he was terminated, December 18, 1998 until his next appointment with Dr. Hoski, January 13, 1999, almost a month. As reflected in Dr. Hoski's notes, there was no significant change in his back condition during January through March 1999.
30. The medical care provided by Dr. Hoski, including the physical therapy he prescribed, was reasonably necessary and was effective in providing plaintiff pain relief and improvement, such that he was able to return to work in December 1998. The follow-up assessment of Dr. Hoski done on July 2, 2001 was reasonable to determine whether plaintiff's ongoing problems were related to the compensable injury of October 5, 1998.
31. As a result of his acute back sprain/strain of October 5, 1998, plaintiff was unable to earn wages and was totally disabled from October 6, 1998 through March 1, 1999. As he was participating in physical therapy until approximately December 14, 1998, when the functional capacity evaluation was done, it was reasonable and necessary that he remained out of work until the December 15, 1998 appointment with Dr. Hoski. Plaintiff had also negotiated with his employer to be out of work during this period in November and December, and therefore should be compensated for that period. Plaintiff was terminated from this employment due to the defendant-employer's perception that plaintiff had deceived him. Therefore, plaintiff's attempt to return to work on December 16, 1998 was unsuccessful due to defendant's decision to terminate him.
32. Plaintiff returned to work at the same or higher wages on March 1, 1999. Plaintiff has been paid temporary total disability benefits at the compensation rate of $337.62 from October 16, 1998 until December 10, 1998. According to the Form 22 wage chart, plaintiff's average weekly wage was $497.30 and his compensation rate is $331.55.
33. The medical assessments of Dr. Duvall and Dr. Loomis have not been shown to be causally related to plaintiff's injury of October 5, 1998. Dr. Loomis saw plaintiff on referral of Dr. Duvall, and this appears to have been for the purpose of a surgical assessment. There has never been any indication that plaintiff's lumbar sprain/strain necessitated any surgical intervention and plaintiff's ongoing back complaints are not the consequence of that back sprain/strain.
34. Plaintiff collected unemployment benefits following his termination from the defendant employer until his return to work for McNeely Trucking on March 1, 1999 at the rate of $273.00 per week and a total of $1911.00.
This claim was defended with reasonable grounds.
36. Defendants have not proven that plaintiff committed fraud in the prosecution of this claim.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following
 CONCLUSIONS OF LAW
1. On October 5, 1998, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with the defendant-employer. This caused an acute back sprain/strain. N.C. Gen. Stat. § 97-2(6).
2. As a consequence of his injury of October 5, 1998, plaintiff was unable to earn wages and was totally disabled from October 6, 1998 through March 1, 1999. Defendants are responsible for paying plaintiff benefits during this period subject to the credits for benefits already paid for plaintiff's temporary total disability at the compensation rate of $337.62 from October 16, 1998 through December 10, 1998 and unemployment benefits paid from December 19, 1998 to February 28, 1999. N.C. Gen. Stat. § 97-29.
3. Although the defendants paid plaintiff compensation at the $337.62, the Form 22 wage chart yields an average weekly wage of $497.30 and a compensation rate of $331.55 and thus, this is the compensation rate at which plaintiff should be paid. N.C. Gen. Stat. § 97-2(5).
4. Defendants are entitled to a credit of unemployment benefits received by plaintiff from the Employment Security Commission from December 19, 1998 to February 28, 1999, a total of $1911.00 against temporary total benefits due under this award. N.C. Gen. Stat. §97-42.1.
5. Defendants are responsible for payment for the medical treatment, which was reasonably necessary as a consequence of plaintiff's back sprain/strain. This includes the treatment and assessments by Dr. Hoski up until the point that Dr. Hoski rated the plaintiff and released him from his care in March 1999, and the final visit to Dr. Hoski on July 7, 2001, which was appropriate as a follow-up to determine whether plaintiff's ongoing complaints were related to the prior lumbar strain. Otherwise, the treatment rendered after Dr. Hoski's release of plaintiff in March 1999, has not been shown to be causally related to the plaintiff's acute back sprain/strain and can not be approved. N.C. Gen. Stat. §§ 97-2(19); 97-25.
6. Plaintiff has reached maximum medical improvement from his back strain and retains a two percent permanent impairment to his back for which he is entitled to six weeks of compensation pursuant to N.C. Gen. Stat. § 97-31(23).
7. The evidence fails to establish that plaintiff's ongoing back complaints are causally related to the lumbar sprain/strain of October 5, 1998, which has resolved. Therefore, plaintiff is not entitled to and defendants are not responsible for ongoing medical care. N.C. Gen. Stat. §§ 97-2(19); 97-25.
8. Plaintiff is not entitled to have attorney's fees assessed against defendant in that the claim was defended with reasonable grounds. N.C. Gen. Stat. § 97-88.1.
9. Defendant has not proven that plaintiff committed fraud in the prosecution of this claim and is therefore not entitled to restitution. N.C. Gen. Stat. § 97-88.2
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Defendants shall pay plaintiff any compensation due for his period of total disability from October 5, 1998 through March 1, 1999, at the rate of $331.55 per week and subject to defendants' entitlement to a credit for temporary total disability that has been previously paid. Defendants shall receive a credit for unemployment benefits paid to plaintiff from December 19, 1998 to February 28, 1999.
2. Defendants shall pay plaintiff any compensation due at the rate of $331.55 per week for six weeks as compensation for his two percent permanent impairment to his back.
3. Defendants shall pay all medical expenses incurred for the reasonably necessary medical treatment provided by Dr. Hoski as found in this opinion.
4. Plaintiff's claim for additional benefits is denied.
5. A reasonable attoraqney's fee of twenty-five percent of plaintiff's compensation due in this opinion is approved for his counsel.
Defendants shall pay the costs, except for the fee requested by William Carrington. The $50 fee approved for Mr. Carrington herein shall be paid by plaintiff.
This the 22nd day of September 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER